STATE ex rel. GEORGE J. BRADLEY and Others v. SAMUEL
G. IVERSON.[1]

June 12, 1914.

Nos. 18,855—(283).

**Game and Fish Commission — standing appropriation abolished.**

1. Chapter 140, Laws of 1913, abolishing standing appropriations, except
where there is a provision for a tax levy or fees or receipts for any purpose
set apart as a special fund, abolished the standing appropriation of hunters'
license fees to the use of the Game and Fish Commission. Such fees were
never "set apart in a special fund" so as to be excepted from the operation
of that act.

**Same — payment of expenses.**

2. Money received by auditors before August 1, 1913, and remitted to
the state treasurer after that date are not available by the commission for
payment of expenses incurred during the fiscal year ending July 31, 1914.

**Title of act.**

3. Chapter 140, Laws of 1913, is not open to the objection that the sub-
ject-matter of the act is not expressed in its title, and it is constitutional.

Upon the relation of George J. Bradley and the other members of
the Game and Fish Commission of the state of Minnesota and Alfred
De Smidt, this court granted its writ of certiorari to review the
ruling of Samuel G. Iverson, as auditor of the state of Minnesota,
declining to grant the request of relators and to approve for payment
vouchers to be presented to him prior to August 1, 1914, for expenses
and services incurred in the maintenance of the Game and Fish
Commission, the same to be paid out of the sums of money previously
remitted by the county auditors of the state to the state treasurer
both for resident licenses issued prior to August 1, 1913, and for
resident licenses issued thereafter. Writ quashed.

*P. W. Guilford* and *H. G. Carleton*, for relators.

[1] Reported in 147 N. W. 946.

*Lyndon A. Smith,* Attorney General, and *Alonzo J. Edgerton,* Assistant Attorney General, for respondent.

HALLAM, J.

*Certiorari* to review a decision of the state auditor, refusing to approve vouchers for expenses of the Game and Fish Commission for payment out of moneys derived from fees for licenses to resident hunters of game birds and animals.

Prior to 1913 all license fees and all moneys collected by the commission from all sources, except fines, were by a standing appropriation devoted to the use of the Game and Fish Commission. Laws 1905, p. 603, chapter 344, § 20; G. S. 1913, § 4775. It also appears that each legislature for some years past had appropriated other money for use of the commission out of the general funds of the state. By chapter 221, p. 409, Laws 1897, there was made a standing annual appropriation of $25,000, and by chapter 344, § 57, p. 621, Laws 1905, a standing annual appropriation of $35,000. There have also been special appropriations from time to time for various purposes. The total of these special appropriations for the year ending July 31, 1912, aggregated $23,700, and for the year ending July 31, 1913, $17,200.

By chapter 140, p. 160, Laws 1913, the legislature abolished all standing appropriations. That act defines a "standing appropriation" as "one which sets apart a specified or unspecified and open amount of public money or funds of the state revenue fund for expenditure for any purpose and makes that amount or some part of it available for use continuously and at a time more distant than the end of the second fiscal year after the session of the legislature at which such appropriation is made." Section 2 of the act contains this language: "Each and every provision of the laws of Minnesota constituting a standing appropriation of money from the revenue fund, or derived from any revenue of the state, or in any way justifying the continuous payment of any money from the treasury of the state, is hereby repealed." By later acts the same legislature made appropriations for the Game and Fish Commission amounting to $82,000

for the year ending July 31, 1914. Laws 1913, p. 581, c. 401, § 37, and chapter 583, p. 879, § 4. This amount was greatly in excess of any appropriations made for the commission for any previous year. It covered by specific terms the full amount of the salaries provided by law (Laws 1913, p. 575, c. 400, § 15); various items of construction and repairs, $17,500 for maintenance of fish hatcheries, and $48,220 for general maintenance.

It is conceded that the provisions of chapter 140, p. 160, Laws 1913, above quoted, abolishing standing appropriations of money derived from any revenue of the state, are broad enough to repeal all prior laws appropriating license fees or any other moneys to the use of the Game and Fish Commission. This language is, however, followed by certain exceptions. It expressly excepts from its operation "cases where there is a provision for a tax levy or fees or receipts for any purpose and set apart in a special fund." Relators claim that the receipts of the state from hunters' licenses issued to residents had been "set apart in a special fund," and so were excepted from the operation of the provisions abolishing standing appropriations. We cannot sustain this contention.

We do not understand on just what theory the relators contend that these particular license fees were ever "set apart in a special fund." The statute providing for these license fees is section 34, chapter 344, p. 609, Laws 1905, as amended by chapter 469, p. 724, Laws 1907, and chapter 373, p. 519, Laws 1911. These statutes provided for licenses to resident hunters and provided that 90 per cent of the fees derived from such licenses be "remitted to the state treasurer, who shall credit same to the Game and Fish Commission fund to be used for the purpose of enforcing the provisions of this chapter."

It is true this act speaks of crediting these license fees to "the Game and Fish Commission fund," but there were other sources of revenue of the commission that were treated in precisely the same manner. For example:

Chapter 267, p. 374, Laws 1911, provided that non-resident fishermen should pay a license fee which should be "remitted to the state

treasurer   *   *   *   who shall credit the same to the Game and Fish Commission fund."

Chapter 315, p. 423, Laws 1907, as amended by chapter 48, p. 67, Laws of 1911, provided for a license to use set lines, seines and nets for the taking of certain fish, upon payment of a license fee, and provided that "all moneys received for same shall be paid to the state treasurer and credited to the Game and Fish Commission fund."

Laws 1905, p. 603, c. 344, § 17, G. S. 1913, § 4772, provided that collections from dam owners on account of construction of fish-ways were "credited to the Game and Fish Commission."

Laws 1905, p. 621, c. 344, § 54; G. S. 1913, § 4898, provided that the proceeds of the sale of furs, fish, and game were paid into the state treasury and "credited to the Game and Fish Commission funds."

In fact by the terms of section 20, c. 344, p. 603, Laws of 1905, G. S. 1913, § 4775, "all moneys collected by the commission   *   *   *   including money received from all   *   *   *   sources, except fines," were "paid into the state treasury and credited to the Game and Fish Commission fund."

In some cases the receipts in question were to be credited to the "fund" of the commission, in one case to the "funds" of the commission, and in one case to the "commission," but the purpose and effect in all cases was the same.

We see no ground for placing receipts from resident hunters' licenses in any other class than the other items mentioned. If the contention of the relators be sound and there had been set apart for their use any such "special fund" as was excepted from the operation of chapter 140, then that fund embraces all of the receipts which had previously been at the disposal of the commission, and the large appropriations made by chapters 401 and 583 were simply a munificent increase of the resources of the commission. It is not claimed by relators that the legislature of 1913 had any such intent, and yet the contention of relators can lead to no other conclusion.

We think that the amount and terms of the appropriations made for the Game and Fish Commission made it quite clear that they

126 M.—8.

were intended to embrace a comprehensive budget of all moneys intended by the legislature for the use of the commission for the present fiscal year. We think it clear that the 1913 legislature did not regard the moneys which had previously been available by the commission as "set apart in a special fund" and exempted from the operation of chapter 140. By that act the legislature intended to abolish the practice of the maintenance of departments of state government by the standing appropriation of department fees or receipts. The scope of the exception contained in chapter 140 is not altogether clear, and we are not called upon to determine its precise limitation, but it does seem clear that it was not intended to add, to the liberal appropriations made for the use of the commission, the fees in question, which it is admitted amounted to more than $30,000. The fact is that the moneys available for the use of the commission prior to 1913 had never been by the state auditor or state treasurer "set apart in a special fund," but have always been carried in the general revenue fund of the state. Whether this practice was right or wrong, the legislature was doubtless advised of the fact and contemplated it when they excepted moneys "set apart in a special fund" from the law abolishing standing appropriations.

But we need not rest the case on this practical construction of the statute alone. We think the state auditor and the legislature were right in considering that these moneys were not by any law "set apart in a special fund." The term "special fund" is one of loose definition. Whether certain moneys are a part of the general revenue fund of the state or are "set apart in a special fund" is a matter of legislative intent to be gathered from all of the various acts on the subject taken together. Where special funds have been created it has usually been by language clear and unequivocal, and the language should be clear to exempt funds from the operation of this general act. There is no such clear intent here to make the receipts of this commission a special fund. We construe the legislation which devoted license fees and other receipts to the use of the commission as a standing appropriation of money derived from department receipts which was one of the forms of standing appropriation that chapter 140 was designed to abolish.

2. Relators claim the use of the sum of $3,017.60 derived from licenses issued by county auditors prior to August 1, 1913, but not remitted to the state treasurer until after that date. We cannot sustain this claim. It must be borne in mind that the auditor is asked to approve vouchers for the payment of expenses accruing and to accrue during the current fiscal year, ending July 31, 1914. We hold that the appropriation made by the 1913 legislature was intended to be the full amount available for such purposes. If the vouchers were for expenses incurred prior to August 1, 1913, a different question would be presented, but no such question is here presented.

3. The constitutionality of chapter 140, p. 160, Laws of 1913, is assailed on the ground that the subject of the act is not expressed in its title. The act is entitled: "An Act to repeal all of the laws and parts of laws providing for standing appropriations." The title sufficiently expresses the subject of the act, and we hold the act constitutional.

Writ quashed.